2006 OK CR 5

**Julius Darius JONES, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2002–534.**

Court of Criminal Appeals of Oklahoma.

Jan. 27, 2006.

Rehearing Granted March 14, 2006.

David McKenzie, Malcolm Savage, Robin McPhail, Assistant Public Defenders, Okla-

homa City, OK, attorneys for defendant at trial.

Wendell b. Sutton, Assistant Public Defender, Oklahoma County Public Defender's Office, Oklahoma City, OK, attorney for appellant on appeal.

Sandra Howell–Elliott, Suzanne Lister–Gump, Assistant District Attorneys, Oklahoma City, OK, attorneys for the State at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

C. JOHNSON, J.

¶1 Appellant, Julius Darius Jones, was tried by a jury in Oklahoma County District Court, Case No. CF 1999-4373, for First Degree Murder, in violation of 21 O.S.Supp. 1998, 701.7(B) (Count 1); Possession of a Firearm after Conviction of a Felony, in violation of 21 O.S.Supp.1998, § 1283 (Count 2); and, Conspiracy to Commit a Felony, in violation of 21 O.S.Supp.1999, § 421 (Count 3). Jury trial was held February 11th—15th, 19th—22nd, 25th—28th, and March 1st—4th, 2002. The jury found Jones guilty as charged on all counts. The Honorable Jerry D. Bass, District Judge, presided at trial. On Count 1, the jury found the existence of two aggravating circumstances: the defendant created a great risk of death to more than one person [1] and there exists the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[2] The jury fixed punishment at death on Count 1, fifteen (15) years imprisonment on Count 2, and twenty-five (25) years imprisonment on Count 3. Formal sentencing was held on April 19, 2002. Judge Bass sentenced Jones in accordance with the jury's verdicts and ordered the sentences be served consecutively. Thereafter, Jones filed this appeal.

¶2 On Wednesday, July 28, 1999, Paul Howell was fatally shot in the driveway of his parents' Edmond home. Howell, his sister, Megan Tobey, and Howell's two young daughters had just returned from a shopping trip in Howell's Chevrolet Suburban. Howell pulled into the driveway and turned the engine off. As Tobey exited from the front passenger side, she heard a gunshot. Tobey turned to see her brother slumped over the driver's seat, and a young black male, wearing a white T-shirt, a stocking cap on his head, and bandana over his face, demanding the keys to the vehicle. Tobey rushed to get herself and Howell's daughters out of the Suburban. As Tobey escorted the girls through the carport, she heard someone yelling at her to stop, and then another gunshot. Tobey got the girls inside and summoned for help. Howell's parents ran outside to find their son lying on the driveway. His vehicle was gone. Howell died a few hours later from a single gunshot wound to the head.

¶3 Two days after the shooting, Oklahoma City police found Howell's Suburban parked near a convenience store on the south side of town. Detectives canvassed the neighborhood and spoke with Kermit Lottie, who owned a local garage. Lottie told detectives that Ladell King, and another man he did not know, had tried to sell the vehicle to him the day before. Lottie realized at the time that the vehicle matched the description given in news reports about the Howell carjacking. Ladell King, in turn, told police that he had agreed to help Christopher Jordan and Jones find a buyer for a stolen vehicle. On the night of the shooting, Jordan came to King's apartment driving a Cutlass; Jones arrived a short time later, wearing a white T-shirt, a black stocking cap, and a red bandana, and driving the Suburban. King told police that Jones could be found at his parents' Oklahoma City home.

¶4 Police then drove to Jones's parents' home, called a telephone number supplied by King, and spoke to someone who identified himself as Julius Jones. Jones initially agreed to come out and speak to police, but changed his mind. Police made several attempts to re-establish telephone contact; eventually a female answered and claimed

---

1. 21 O.S.2001, § 701.12(2).

2. 21 O.S.2001, § 701.12(7).

Jones was not there. While some officers maintained surveillance at the home, others sought and obtained warrants to arrest Jones and search his parents' home for evidence. Police found a .25–caliber handgun, wrapped in a red bandana, secreted in the attic through a hole in a bedroom ceiling and found papers addressed to Jones in the bedroom. Police also found a loaded, .25–caliber magazine, hidden inside a wall-mounted door-chime housing. Further investigation revealed that the bullet removed from Howell's head, and a bullet shot into the dashboard of the Suburban, were fired from the handgun found in the attic of the Jones home.

¶ 5 Christopher Jordan was arrested on the evening of July 30. Jones, who managed to escape his parents' home before police had secured it, was arrested at a friend's apartment on the morning of July 31. The two men were charged conjointly with conspiracy to commit a felony, and with the murder of Howell. Jordan agreed to testify against Jones as part of a plea agreement. At trial, Jordan testified that the two men had planned to steal a Chevrolet Suburban and sell it; that they followed Howell's vehicle for some time with the intent to rob Howell of it; that once Howell pulled into the driveway, Jordan stayed in their vehicle while Jones, armed with a handgun, approached the Suburban on foot; that after the robbery-shooting, Jones drove the Suburban away and told Jordan to follow him; and that Jones subsequently claimed his gun had discharged accidentally during the robbery.

¶ 6 Additional facts will be presented as relevant to the issues discussed below.

## JURY ISSUES

¶ 7 In Proposition Thirteen, Jones submits that errors during jury selection violated his right to a fair and impartial jury in violation of both his federal and state constitutional rights. Jones complains about the trial court's use of the "struck juror" method of jury selection and about the trial court's removal of a juror for cause. Defense counsel objected to the trial court's use of the "struck juror" method of jury selection and his objection was overruled. Appellate counsel ar-

gues this method does not comply with applicable statutes, violates Oklahoma law, and constitutes a federal procedural and/or substantive due process violation.

¶ 8 Oklahoma statutes do not specifically prescribe a method of jury selection. *See* 22 O.S.2001, §§ 600, 653. Further, the method of voir dire is discretionary with the trial court. *Smith v. State*, 1987 OK CR 94, ¶ 53, 737 P.2d 1206, 1217. The trial court's use of the "struck juror" method did not deprive Jones of a fair and impartial method of jury selection. Jones was provided the opportunity to examine each prospective juror to determine whether grounds existed to challenge the juror for cause and was allowed to exercise all of his peremptory challenges provided for by law. *See Nelson v. State*, 1977 OK CR 224, ¶ 5, 567 P.2d 522, 524 (recognizing similar method taken from Section 575.1 of Title 12, in accordance with Title 22, Section 592).

¶ 9 We are not persuaded by Jones's claim that this "struck juror" procedure prejudiced him because three prospective jurors were not asked whether they knew the victim and/or any of the witnesses whose names were previously read to the other prospective jurors. Whether the trial court asked each prospective juror individually the same questions does not render the method of voir dire unfair. Trial counsel had the opportunity to clarify the trial court's questions and to pose additional questions to any prospective juror. It is trial counsel's duty to examine jurors on voir dire to discover any facts affecting their qualifications to sit as jurors and then reasonably raise any objection that might exist as to any member of the panel. *Wackerly v. State*, 2000 OK CR 15, ¶ 9, 12 P.3d 1, 8. "Failure to do so waives all but plain error." *Id.*

¶ 10 We find no plain error. Jones has not shown the method of voir dire affected his substantial rights or that he was prejudiced by the manner of jury selection and questioning of the potential jurors. *Valdez v. State*, 1995 OK CR 18, *f.* 6, 900 P.2d 363, 369, *f.* 6. (plain errors are errors which counsel failed to preserve through a trial objection, but which upon appellate review, are clear from

the record and affect substantial rights), *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698 (plain error is an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense).

¶ 11 Jones also complains the trial court's decision to remove another juror for cause, over defense counsel's objection, violated his federal constitutional rights and warrants reversal of his convictions and sentences. Jones submits this potential juror was intentionally trying to avoid jury service by stating he would not fairly consider all punishment options and the trial court's refusal to allow counsel an adequate opportunity to rehabilitate the potential juror was error.

¶ 12 The record reflects the subject potential juror was initially ambiguous in his answers about whether he would be able to fairly consider all three punishment options for murder. However, upon further questioning by the trial court, the potential juror became more firm in his responses and clearly stated he could not and would not vote for the death penalty under any circumstances.

¶ 13 "When reviewing cases where the answers of potential jurors are unclear or equivocal this Court traditionally defers to the impressions of the trial court who can better assess whether a potential juror would be unable to fulfill his or her oath." *Scott v. State*, 1995 OK CR 14, ¶ 10, 891 P.2d 1283, 1289. Here, the trial court observed this potential juror's demeanor and considered his responses, and we give deference to the trial court's decision to remove him. *Id.* This potential juror's unequivocal responses were sufficient for the trial court to dismiss him for cause. *Williams v. State*, 2001 OK CR 9, ¶ 13, 22 P.3d 702, 710. We also find no error occurred when the trial court denied defense counsel's request for an opportunity to rehabilitate the juror. *Scott*, 1995 OK CR 14, ¶ 11, 891 P.2d at 1289 (when the trial court has asked proper questions to determine whether the prospective jurors can sit in the case, it is not error to deny defense counsel an opportunity to rehabilitate the excused jurors).

¶ 14 In Proposition Fourteen, Jones claims improper jury influences violated his right to a fundamentally fair trial and an impartial verdict affecting both stages of trial. During first stage proceedings, three jurors received potentially threatening or hang up telephone calls, one juror's home was burglarized, and the codefendant's attorney exchanged a hand-shake greeting with one of the jurors. During second stage proceedings, two jurors allegedly engaged in premature deliberations. The trial court held *in camera* hearings and made inquiries concerning each of these incidents. This claim of error does not warrant relief for the reasons set forth below.

¶ 15 Those jurors who received the hang-up or unwanted telephone calls each indicated the calls would not affect their ability to be fair and impartial. They did not believe the calls were related to the trial. The trial court determined the jurors were not affected by the telephone calls to Jones's prejudice and properly denied the motion for mistrial. *See Flores v. State*, 1999 OK CR 52, ¶ 22, 994 P.2d 782, 786–787 (excused juror's sympathy towards victim's mother in front of jury did not prejudice defendant and without showing of prejudice no relief was required).

¶ 16 The juror whose home was burglarized over a weekend trial recess told the trial court she had gone to the District Attorney's office to file a complaint and was told she would have wait until the trial concluded. Defense counsel's request to excuse the juror was denied. The decision to excuse a sitting juror and replace the juror with an alternate for good cause rests within the discretion of the trial judge. *See Miller v. State*, 2001 OK CR 17, ¶¶ 23–26, 29 P.3d 1077, 1082–1083. Here, the juror told the trial court the burglary of her home would not affect her ability to be fair and the trial court properly denied the request to excuse this juror.

¶ 17 The third alleged instance of improper jury conduct—the codefendant's attorney's hand-shake greeting of a juror—also does not warrant relief. Defense counsel, after being informed of the contact by the trial court, did not ask to question the juror

concerning the contact and did not ask the trial court to remove the juror. Therefore, we review for plain error. *Simpson,* 1994 OK CR 40, ¶ 2, 876 P.2d at 692–693.

▮ ¶ 18 On appeal, counsel claims because a determination was not made concerning whether the juror was improperly affected, prejudice should be presumed. We do not agree. Here, the codefendant's attorney did not tell the juror why he was in the courtroom and did not return to the courtroom after the incident. We will not presume prejudice from this juror's casual contact with an attorney whose interest in the trial was not apparent to the juror. *Cf. Fields v. State,* 1961 OK CR 75, ¶ 15, 364 P.2d 723, 728 (casual contact with attorney interested in civil aspects of the trial prior to final submission to the jury did not constitute *prima facie* misconduct requiring reversal absent showing of prejudice). Jones has not shown he was prejudiced by this occurrence and certainly has not shown he was deprived of a fair jury and a fair trial.

▮ ¶ 19 Lastly, Jones complains about premature deliberations during the second stage of trial prior to second stage deliberations. The record shows one of the jurors informed the trial court she overheard another juror make a statement [3] which indicated to her that the other juror had already made up his mind and possibly could influence other jurors if they heard it. The trial judge then individually questioned the other jurors to determine if anyone else heard the statement. All other jurors denied hearing another juror express an opinion as to the appropriate penalty or punishment. Juror Y, alleged to have made the statement, denied making a statement concerning what the punishment should be, but then later admitted he "could have said that, yes." He also admitted he had formed a "partial" opinion on what he thought the punishment should be but was waiting to hear the rest of the evidence. Following inquiry of Juror Y, the trial court questioned the reporting juror again who said she only heard part of the statement and admitted she did not know if

it was related to the case. Defense counsel's requests to further question Juror Y and then to excuse the juror for cause were denied. Jones complains the denial of those requests was improper and the premature deliberation by even one juror warrants relief.

▮ ¶ 20 A claim of juror misconduct before a criminal case is submitted to a jury must be established by clear and convincing evidence. *Glasgow v. State,* 1962 OK CR 41, ¶ 16, 370 P.2d 933, 936; *Pennington v. State,* 1995 OK CR 79, ¶ 18, 913 P.2d 1356, 1363. Jones must show actual prejudice from any jury misconduct and "defense counsel's mere speculation and surmise is insufficient upon which to cause reversal." *Woodruff v. State,* 1993 OK CR 7, ¶ 13, 846 P.2d 1124, 1132, *quoting Chatham v. State,* 1986 OK CR 2, ¶ 7, 712 P.2d 69, 71. The trial court personally observed the jurors and their responses. We will not disturb its refusal to allow additional questioning and/or excuse the allegedly offending juror for misconduct absent an abuse of discretion. *Teafatiller v. State,* 1987 OK CR 141, ¶ 18, 739 P.2d 1009, 1012. The trial court did not abuse its discretion. Jones has failed to show that any of his alleged misconduct was prejudicial; therefore, this proposition fails.

### FIRST STAGE ISSUES

¶ 21 In Proposition One, Jones claims that evidence seized from his parents' home pursuant to a search warrant was improperly admitted. On July 30, 1999, police officers, believing Jones was present, surrounded Jones's parents' home and attempted to make contact with Jones by telephone. An officer spoke with an individual who identified himself as Jones, and some time later, Jones's parents, sister and brother came out of the house. Jones's father told police that Jones was not in the house and invited the police inside to look for him. The officers informed Jones's parents they would wait on a search warrant due to safety concerns. Thereafter, officers obtained a search war-

---

3. Juror X told the trial court she heard Juror Y make "a comment that they should place him in

a box in the ground for what he has done."

rant. A police tactical team entered the house around 9:30 p.m. and declared it secure by 10:00 p.m. Jones was not inside. After that, the search team entered the house and conducted the search.

¶ 22 The search yielded items seen by the victim's sister during the crime, clothing items that King saw Jones wearing thirty minutes after the crime, a semi-automatic, chrome-finished pistol consistent with a gun King said Jones habitually carried, a red bandana, the pistol's magazine and bullets, a dark green and a black stocking cap, and a white tee shirt with black trim.

¶ 23 Jones filed a motion to suppress all the evidence prior to trial, arguing the affidavit for search warrant lacked probable cause, night-time authorization was improper under 22 O.S.Supp.1999, § 1230, and the night-time search was improper. The trial court denied the motion to suppress. At trial, Jones objected to the admission of the evidence on the basis that the night-time search was not supported by sufficient facts.

■■■ ¶ 24 Jones claims the information in the affidavit was insufficient to ensure the issuing magistrate had a substantial basis for concluding that probable cause existed. He complains that the affidavit did not contain a factual basis establishing that evidence would be found in Jones's parents' residence and did not include any information establishing the reliability of the statement from, or the veracity of, Ladell King. Jones also claims his trial counsel was ineffective for failing to object to the search warrant on the basis that the affidavit contained deliberate false and/or misleading information. An argument raised in support of a motion to suppress which is not raised at trial is waived. *Young v. State,* 1998 OK CR 62, ¶ 22, 992 P.2d 332, 339. Therefore, we review Jones's claim that the affidavit was insufficient to establish probable cause for plain error. *Cheatham v. State,* 1995 OK CR 32, ¶ 48, 900 P.2d 414, 427.

■■■ ¶ 25 We give a magistrate's finding of probable cause great deference. *Mollett v. State,* 1997 OK CR 28, ¶ 14, 939 P.2d 1, 7. The residence of a person suspected of a crime is a natural place for concealing evidence of that crime. *Id.,* 1997 OK CR 28, ¶ 15, 939 P.2d at 7. Further, facts to establish the reliability of information obtained from King was not necessary, because King was named in the affidavit as the giver of the information. *Caffey v. State,* 1983 OK CR 39, ¶ 11, 661 P.2d 897, 900. Upon review, we find the information set forth in the affidavit sufficient to support the magistrate's finding of probable cause and issuance of the search warrant.

¶ 26 We also find trial counsel was not ineffective for failing to object and request a *Franks* [4] hearing to determine whether the police knowingly or with reckless disregard for the truth included false or misleading information in the affidavit or omitted critical information. Jones submits the police intentionally omitted critical information from the affidavit—that the police knew Jones had left the residence prior to obtaining the search warrant. The record shows the police had Jones's residence surrounded and attempted contact with Jones, whom they believed was inside, at the time other officers were preparing the affidavit. Around 4:30 p.m., Jones's father told police Jones was not inside. This information was not included in the affidavit which was presented to the magistrate around 7:00 p.m.

■■■ ¶ 27 In *Franks v. Delaware* [5], the Supreme Court held that an affidavit supporting a factually sufficient search warrant might be attacked upon allegations that the affidavit contained intentional lies or reckless disregard for the truth. If the inaccuracies are removed from consideration and there remains in the affidavit sufficient allegations to support a finding of probable cause, the inaccuracies are irrelevant. *Id.,* 438 U.S. 154, 171, 98 S.Ct. at 2684, 57 L.Ed.2d 667. To determine whether the inaccuracies are irrelevant, we ask whether the warrant would have been issued if the judge had been given accurate information. *Wackerly,* 2000 OK CR 15, ¶ 13, 12 P.3d at 9. We find, even had the affidavit included Jones's parents' claim that Jones had left the home, a sub-

---

4. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

5. *See f.* 4.

stantial basis for the issuance of the warrant would have existed and the warrant would have properly been issued.

¶ 28 The magistrate had a substantial basis for concluding that probable cause existed. No plain error occurred. Further, trial counsel's failure to attack the sufficiency of the affidavit at trial and request a *Franks* hearing does not constitute deficient performance, as such an objection would have failed. *Phillips v. State*, 1999 OK CR 38, ¶ 104, 989 P.2d 1017, 1044.

¶ 29 At trial, counsel objected to admission of the evidence seized pursuant to the search warrant on the basis that the search was conducted in the night-time and that the night-time service of the warrant was improperly granted. A search warrant for an occupied dwelling must be served between the hours of 6:00 a.m. and 10:00 p.m., unless the issuing magistrate finds there is a likelihood the property named in the search warrant will be destroyed, moved or concealed. 22 O.S.2001, § 1230. Here, the issuing magistrate authorized service at any time, but did not provide written findings supporting his decision. After a pre-trial hearing, the judge hearing the motion to suppress determined that actual entry into the residence was made prior to 10:00 p.m. and therefore whether the night-time authorization and service was proper was moot. Now on appeal, Jones contends the time of the officers' initial entry into the home is not controlling; the time the officers entered the home with the intent to search and began to conduct the search is controlling for determining whether the search was conducted at night.

¶ 30 An otherwise valid search warrant which authorizes service at any time, but which is not supported by facts required by 22 O.S.2001, § 1230, is not void for this reason alone when the warrant is in fact served in the daytime. *State v. Stafford*, 1992 OK CR 47, ¶ 8, 845 P.2d 894, 895. In this case, a police tactical team entered the residence around 9:30 p.m., after officers had been watching the house for over six hours. The tactical team entered first to secure the residence and to serve the arrest warrant and arrest Jones, so that the search for items of evidence could proceed safely. We find this preliminary safety sweep constituted the initial execution of the search warrant. The trial court correctly found that the search commenced upon the tactical team's initial entry into the residence. Although the search for the items listed in the warrant did not begin until after 10:00 p.m., the service of the search warrant begins once an officer crosses the threshold for the purpose of beginning the search or for securing the residence for a later search. Therefore, because the search commenced prior to 10:00 p.m., Jones's complaint that the affidavit did not support night-time service is moot. The trial court did not abuse its discretion by admitting evidence recovered during the search, and this proposition fails.

¶ 31 In Proposition Two, Jones contends the evidence was insufficient to prove he shot and killed Mr. Howell or that he was a principal in the conspiracy to the underlying felony of armed robbery. First he asserts the physical evidence recovered during the search should not have been considered because it was not properly admitted. Secondly, Jones argues that both King and Jordan were accomplices or coconspirators as to both Counts 1 and 3 and, because their testimony was not corroborated, the jury could not properly consider it.

¶ 32 We review claims going to the sufficiency of the evidence by viewing the evidence in a light most favorable to the State to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. Contrary to Jones's assertions, we find the evidence presented was sufficient on both Counts 1 and 3.

¶ 33 We have already determined that the admission of the physical evidence recovered during the search of Jones's parents' residence was proper. Accomplice testimony must be corroborated with evidence, which standing alone tends to link the defendant to the commission of the crime charged. 22 O.S.2001, § 742. An accomplice's testimony need not be corroborated in all material respects; the amount of corroboration required is simply "at least one material fact of

independent evidence which tends to connect the defendant with the commission of the crime." *Cummings v. State,* 1998 OK CR 45, ¶ 20, 968 P.2d 821, 830. The test used to determine whether a witness is an accomplice is whether he or she could be indicted for the crime which the accused is being tried for. *Anderson v. State,* 1999 OK CR 44, ¶ 23, 992 P.2d 409, 418.

¶ 34 Corroboration of the codefendant Jordan's testimony was required as he clearly was an accomplice. However, King's testimony did not need to be corroborated, because the record does not show he was an accomplice. King was not involved in Howell's murder in any way, and there was no evidence that he was involved in any preconceived plan to participate in the underlying felony. Because King was not an accomplice as a matter of law, the jury could properly consider his testimony and statements without corroboration, and his testimony could corroborate the accomplice/codefendant Jordan's testimony. Besides King, other witnesses corroborated Jordan's testimony and established at least "one material fact of independent evidence" that tended to connect Jones to both crimes.[6] *Cummings,* 1998 OK CR 45, ¶ 20, 968 P.2d at 830.

¶ 35 This Court will not disturb a jury verdict where there is sufficient evidence to support it, as it is the jury's exclusive province to weigh the evidence and determine the facts. *Torres v. State,* 1998 OK CR 40, ¶ 38, 962 P.2d 3, 16. From the physical evidence presented, the corroborated testimony of the codefendant Jordan, and the testimony of other witnesses at trial, in a light most favorable to the State, we find a rational trier of fact could conclude beyond a reasonable doubt that Jones was guilty of both First Degree Felony Murder and Conspiracy to Commit a Felony.

¶ 36 In Proposition Three, Jones contends the evidence was insufficient to prove he was in possession of a firearm. Again, Jones presumes the physical evidence

recovered during the search was inadmissible and the testimony of King and Jordan was not sufficiently corroborated, leaving insufficient evidence to prove Count 2. We disagree.

¶ 37 The .25 caliber chrome-plated semi-automatic pistol which was used to kill Howell was found in Jones's home in the insulation near an attic access in Jones's bedroom, and it was properly admitted. Jones admitted to his girlfriend prior to Howell's murder that he had a .25 caliber chrome semi-automatic pistol which he kept for protection. The codefendant Jordan testified that Jones had a gun, that Jones planned to use it when they planned to rob Howell and take his Suburban, and that he saw Jones with the gun in hand at the time Jones approached Howell. Jordan testified that he was with Jones when he bought the pistol and saw Jones in possession of the gun days prior to the murder. Further, the evidence established that Jones had a prior felony conviction. In a light most favorable to the State, a rational trier of fact could have found the essential elements of possession of a firearm after a felony conviction beyond a reasonable doubt. *Spuehler,* 1985 OK CR 132 at ¶ 7, 709 P.2d at 203–04.

¶ 38 In Proposition Four, Jones argues the trial court's refusal to give his requested first-stage jury instructions deprived him of a fundamentally fair trial. From the record, it appears the trial court did not refuse Jones's requested instructions on Voluntary Statement by Defendant (OUJI–CR 2d. 9–12) and Necessity for Corroboration of Confessions (OUJI–CR 2d. 9–13), but rather inadvertently omitted them from the final instructions given to the jury.

¶ 39 Whether or not omission of these instructions was inadvertent, trial counsel did not object to the missing instructions and our review is for plain error. *Phillips,* 1999 OK CR 38, ¶ 66, 989 P.2d at 1036. Even if error occurred in the inadvertent omission of these instructions, we find the

---

**6.** For example, besides King, another witness testified he saw Jones in the parking lot of his apartment complex, shortly after Howell was shot, with a brown Suburban matching the description of Howell's stolen Suburban. Another

witness testified he saw the codefendant's vehicle, with two young black males, circling the Braum's parking lot at approximately the same time the victim and his family were at the Braum's drive-through.

error was harmless beyond a reasonable doubt. *See Davis*, 1999 OK CR 48, ¶ 15, 993 P.2d at 127 (failure to give OUJI–CR 2d 9–12 harmless in light of the entire record). The evidence was clear and uncontested that Jones's admissions to Jordan and King were voluntary. Furthermore, there was overwhelming evidence introduced to corroborate them.

 ¶ 40 Jones also submits the trial court's refusal to give his requested instructions on Accessory (OUJI–CR 2d 2–1, 2–2, 2–3, 2–4) and a version of the non-unanimous instruction (OUJI–CR 2d 10–27) as modified in *Graham v. State*, 2001 OK CR 18, ¶ 6, 27 P.3d 1026, 1027–1028. The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court and absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. *Patton v. State*, 1998 OK CR 66, ¶ 49, 973 P.2d 270, 281–282.

¶ 41 The evidence in this case clearly showed that Jones's participation in the murder and robbery of Howell was more than simply an accessory after the fact. He participated as a principal, and accessory after the fact instructions were neither required nor warranted under the facts of this case. *See Cummings*, 1998 OK CR 45 at ¶ 40, 968 P.2d at 834. The trial court did not abuse its discretion by refusing these requested instructions.

¶ 42 In Proposition Five, Jones claims the improper admission of evidence and a flight instruction violated his right to remain silent and his right to due process and a fundamentally fair trial. Trial counsel moved, *in limine*, to preclude the admission of evidence that he left his home after the police requested that he come out of the residence and talk about the murder. He contends this evidence violated his fundamental right to remain silent and the trial court improperly denied the motion. The State introduced

testimony showing Jones left the house *via* second story window because police were everywhere and that he left the area so that he could hire an attorney and get things straightened out. The trial court then gave the flight instruction, OUJI–CR 2d 9–8, during first stage over defense objection.

 ¶ 43 We find no Fifth Amendment violation here where Jones neither testified nor was asked questions about his pre-arrest silence, and this Court's holding in *Farley v. State*, 1986 OK CR 42, ¶¶ 4–6, 717 P.2d 111, 112–113 is not applicable. Flight instructions are appropriate where defendant's statements concerning departure are made in a voluntary confession. *Mitchell v. State*, 1993 OK CR 56, ¶ 8, 876 P.2d 682, 684. Under these circumstances, the defendant either admits to the alleged crime and/or places himself at the scene, thus removing any assumptions. *Id.* In this case, Jones told Vickson McDonald that he had to leave his house through a second story window, and he told Analiese Presley that he was leaving to get a lawyer. These statements explained or controverted the State's evidence of flight which showed Jones fled from a second story window after an officer talked to him by phone and asked him to come out of the house. The flight instruction was properly given. *Mitchell*, 1993 OK CR 56, ¶ 9, 876 P.2d at 684.

 ¶ 44 Prior to trial, the trial court sustained Jones's motion *in limine* regarding the use of evidence relating to the "Hideaway robbery events."[7] As to use of the term "carjacking," the trial court ruled the witnesses would be able to testify in their own words and the State agreed to limit the police officers to use of the term "robbery" instead of "carjacking." In Proposition Six, Jones argues the improper admission of other crimes evidence through witness testimony during first stage of trial violated the ruling *in limine* and his right to a fair trial. Trial counsel objected in several instances and his objections were sustained, curing any

---

7. About a week before Howell's murder, two vehicle robberies, or "carjackings," took place near a Hideaway Pizza restaurant in north Oklahoma City. Once Jones and Jordan were arrested for Howell's murder, police began to focus on the two men as the perpetrators in the Hideaway crimes as well. The State was permitted to use the Hideaway crimes in the capital sentencing phase of Jones's trial, to show that he posed a continuing threat to society.

error which may have occurred. *Young v. State,* 2000 OK CR 17, ¶ 50, 12 P.3d 20, 37. Those instances which were not met with a timely objection, we review for plain error. *Simpson,* 1994 OK CR 40, ¶ 2, 876 P.2d at 692–693.

¶ 45 Of those errors not receiving contemporaneous objections, Jones claims the use of the word "carjacking" by Kermit Lottie violated the court's pre-trial ruling. The ruling by the trial court at the motion hearing was that non-police witnesses, such as Kermit Lottie, would be able to describe events in their own words. Therefore, we find no error. Jones complains Flowers' testimony about gang violence, gang investigations and the prevalence of gangs in the area where the Suburban was found was unfairly prejudicial, but we disagree and find no plain error.

¶ 46 Jones objected to the codefendant Jordan referring to Jones getting out of the Cleveland County jail. The trial court sustained the objection and admonished the jury. We find that the admonishment to the jury was sufficient to cure any error and no plain error occurred. Jones objection to the prosecutor's statement that Jones was "afforded an opportunity to escape that residence" was also sustained, the jury admonished, and we find the admonishment was sufficient to cure any error.

¶ 47 Lastly, Jones complains King's testimony improperly introduced other crimes evidence. King testified Jones and Jordan told him they had a "hookup" on some cars and asked him if he knew anyone who would buy them. After a lengthy hearing, the trial court ruled that the evidence was *res gestae.*

¶ 48 Evidence of other crimes or bad acts is generally inadmissible, but may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." 12 O.S.2001, § 2404(B). Other crimes evidence may also be admissible where it is part of the *res gestae* of the crime charged. *Pickens v. State,* 2001 OK CR 3, ¶ 20, 19 P.3d 866, 876; *Neill v. State,* 1994 OK CR 69, ¶¶ 35–36, 896 P.2d 537, 550–51. The *res gestae* exception differs from the other listed exceptions to the evidence rule; in the other exceptions, the other offense is intentionally proven, while in the *res gestae* exception, the other offense incidentally emerges. *Neill, id.* The final decision on the admissibility of evidence is left to the sound discretion of the trial court, and absent a clear showing of abuse and resulting prejudice, this Court will not disturb the trial court's ruling. *Pickens,* 2001 OK CR 3, ¶ 21, 19 P.3d at 876.

¶ 49 Here, we find no abuse of discretion in the admission of King's testimony. It showed Jones's conduct in the conspiracy as an occurrence forming an integral part of the transaction which completed the picture of the offense charged. *Van White v. State,* 1999 OK CR 10, ¶ 75, 990 P.2d 253, 273. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice as required by 12 O.S.2001 § 2403. Jones could not have been surprised by the testimony as providing essential background to the conspiracy charge.

¶ 50 In Proposition Seven, Jones argues the State's failure to disclose, or defense counsel's failure to adequately investigate, obtain and use, available *Brady* material violated his rights to confrontation, due process, and to effective assistance of counsel. Specifically, Jones contends the State's failure to disclose a letter written to the federal court concerning Lottie's cooperation as a witness, King's pending Oklahoma County bogus check charge, and its knowledge of the owner of cigarettes found in the victim's Suburban violated the provisions of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963). Alternatively, Jones argues his trial counsel was ineffective for failing to discover the information.

¶ 51 "Due process requires the State to disclose exculpatory and impeachment evidence favorable to an accused. *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d [104] (1972), *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)." *Wright*

*v. State*, 2001 OK CR 19, ¶ 22, 30 P.3d 1148, 1152. To establish a *Brady* violation, a defendant must show that the prosecution suppressed evidence that was favorable to him or exculpatory, and that the evidence was material. *Paxton v. State*, 1993 OK CR 59, ¶ 15, 867 P.2d 1309, 1318. In *Bagley*, the Supreme Court established a single test for materiality:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. The question is not whether the verdict more likely than not would have been different, but "whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566.

■ ¶ 52 The evidence relating to Lottie and King was impeachment evidence which should have been disclosed to Jones prior to trial. *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380. However, the additional criminal charges were discovered during the trial and King and Lottie were recalled to testify about most of the other charges. Jones was not unduly prejudiced by the untimely disclosure of this impeachment information and was not denied a fair trial. As Jones cannot show prejudice from the untimely disclosure of this impeachment evidence, we also find he has not shown his trial counsel was ineffective for failing to discover the evidence. *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984) (when a claim of ineffective counsel can be disposed of on the ground of lack of prejudice, that course should be followed).

■ ¶ 53 The letter to federal courts concerning Lottie's cooperation as a witness [8] was not discovered until shortly after trial although it was written more than one year before trial. Jones claims the letter could have been used to impeach Lottie who testified he had no expectation of receiving any lenient treatment in his federal case in exchange for his testimony against Jones. Jones asserts the information that King was previously an informant also could have been used to attack his credibility. The prosecution had a duty to discover and disclose the letter written by Detective Fike. *Kyles*, 514 U.S. at 437, 115 S.Ct. at 1567 (it is the duty of the prosecution to ascertain any favorable evidence known to those acting on behalf of the State, including the police).

¶ 54 Lottie's plea agreement and a motion for continuance filed in the federal case was introduced at trial and the jury was aware of the pending federal proceeding and the charges against Lottie. Trial counsel cross-examined Lottie about any deals which might have been made on his behalf. As the trial court noted, Lottie's testimony was the same before and after the federal charges were filed; its consistency demonstrated his testimony was unaffected by what he thought would or would not happen to him at his federal sentencing. The record demonstrates the jury knew Lottie had federal charges against him for which he would be sentenced and knew his testimony at Jones's trial was the basis for the continuance request in the federal trial.

■ ¶ 55 The possibility that an item of undisclosed information might have helped the defense or affected the outcome does not establish materiality. *Knighton v. State*, 1996 OK CR 2, ¶ 43, 912 P.2d 878, 890. We find the letter was not material. Had Lottie's testimony not been admitted at all, the evidence presented against Jones was overwhelming. Even had the letter been disclosed and known to defense counsel at the time of trial, we cannot say its use as im-

---

8. The letter was authored by Detective Fike, was written on Edmond Police Department stationery, was dated 1/25/2001 and was addressed to Assistant U.S. Attorney Mary Smith. The letter stated, in pertinent part: "If Kermit had not cooperated with my investigation I believe the homicide would be unsolved to this day. Thus, I am writing you due to a request from Kermit to help him in his upcoming sentencing hearing.... If there is anything that you can do to help Kermit I would appreciate it." The letter also said, "I knew [Mr. King] because he had been an informant of mine when I worked on the D.A.'s task force."

peachment evidence would have affected the outcome of the trial.

¶ 56 Jones also claims evidence that cigarettes found in the victim's Suburban belonged to the victim's friend should have been disclosed prior to trial and was not. As a result, defense counsel attempted to show the cigarettes belonged to King. Jones contends that because the owner of the cigarettes was not disclosed timely, the prosecution unfairly undermined the credibility of the defense for wasting time on a non-issue.

¶ 57 The State did not use the cigarettes as evidence linking Jones to the crime. As Jones admits, who owned the cigarettes was a non-issue and this information was not material.

¶ 58 After careful review, we find the cumulative effect of the *Brady* violations does not warrant relief. Jones received a verdict worthy of confidence even in the absence of the letter pertaining to Lottie and the evidence of additional criminal charges against witnesses Lottie and King. Any error pertaining to the non-disclosure of this information does not raise a reasonable probability sufficient to undermine confidence in the outcome of this trial and was harmless beyond a reasonable doubt. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3384; *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

¶ 59 FBI examiner Lundy testified at trial that all the bullets recovered as physical evidence in this case were "analytically indistinguishable and chemically the same" and would have come from the same source of lead at Remington. She also admitted there were likely upwards of three million other boxes of ammunition with the same chemical composition. In Proposition Nine, Jones argues his inability to confront Lundy on cross-examination with her prior, but unknown at trial, perjurious expert testimony, violated her right of confrontation and due process under both the federal and Oklahoma Constitutions.

¶ 60 Over a year after Jones's trial concluded, Lundy, no longer employed with the FBI, pled guilty to a misdemeanor count of false swearing in Kentucky relating to expert testimony on bullet lead composition which she gave in a pretrial hearing shortly before Jones's trial. Jones argues his counsel's inability to confront Lundy with this prior perjurious testimony was fundamentally unfair and constituted a due process violation.

¶ 61 We disagree. We will not find Jones's confrontation and due process rights violated by something that had not occurred at the time of his trial. Jones cannot show he was prejudiced by the inability to cross-examine Lundy on this claim. *DeRosa v. State,* 2004 OK CR 19, ¶ 53, 89 P.3d 1124, 1145. Lundy's testimony was not highly compelling, particularly when one considers her admission that over three million boxes of ammunition would have the same chemical makeup, and the other strong evidence—particularly the toolmark evidence showing the recovered bullets were all fired from the same gun—which was admitted at trial. Jones cannot demonstrate the outcome of his trial would have been different had trial counsel known Lundy's testimony in an unrelated proceeding was later found to be perjurious.

¶ 62 In Proposition Twelve, Jones argues his convictions for both Conspiracy to Commit Robbery (Count 3) and Robbery–Murder (Count 1) violate State or federal constitutional prohibitions against double jeopardy and the Oklahoma statutory provision against double punishment. Jones concedes prior cases hold that a conviction for conspiracy and the substantive offense ordinarily do not violate double jeopardy, but argues that because the conspiracy was based on the underlying felony of armed robbery, the same underlying felony for the felony murder, the conspiracy count should be dismissed. Jones asks this Court to reconsider its holding in *Davis v. State,* 1999 OK CR 48, 993 P.2d 124.

¶ 63 Oklahoma law provides that "an act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions ... but in no case can it be punished under more than one[.]" 21 O.S. 2001, § 11A. The proper analysis of a Section 11 claim focuses on the relationship between the crimes. *Davis,* 1999 OK CR 48, ¶ 13, 993 P.2d at 126. "One act that violates two

criminal provisions cannot be punished twice, absent specific legislative intent. This analysis does not bar the charging and conviction of separate crimes which may only tangentially relate to one or more crimes committed during a continuing course of conduct." *Id.*, 1999 OK CR 48, ¶ 13, 993 P.2d at 127. Section 11 is not violated where offenses arising from the same transaction are separate and distinct and require dissimilar proof. *Hale v. State,* 1995 OK CR 7, ¶ 4, 888 P.2d 1027, 1029; *see also Doyle v. State,* 1989 OK CR 85, ¶ 16, 785 P.2d 317, 324 (where a single act constitutes a violation of two statutory provisions, dissimilar proof of the elements is required if the elements of the several offenses are identical). A traditional double jeopardy analysis is only conducted if Section 11 does not apply. *Mooney v. State,* 1999 OK CR 34, ¶ 14, 990 P.2d 875, 882–883.

¶ 64 Conspiracy is a crime, separate and distinct, from the underlying crime contemplated. *Littlejohn v. State,* 1998 OK CR 75, ¶ 30, 989 P.2d 901, 909–10; *Huckaby v. State,* 1990 OK CR 84, 804 P.2d 447, 450. Conspiracy to commit a crime requires an agreement between two or more people to commit an unlawful act, and some overt act by one or more of the parties in furtherance of this agreement. *Jones v. State,* 1998 OK CR 36, ¶ 3, 965 P.2d 385, 386.

¶ 65 Here, the act of plotting with Jordan to steal a Suburban, and following the victim in his Suburban from Braum's parking lot to his Edmond home, is what led to Jones's conviction for Conspiracy to Commit a Felony. The agreement and overt act were complete before any act giving rise to Count 1 was carried out. Two separate acts were clearly committed; punishment for both is not prohibited under Section 11A. *Littlejohn, id.*

¶ 66 Because Section 11 does not apply, we now conduct a traditional double jeopardy analysis. This Court exclusively applies the "same evidence" test in its analysis of a double jeopardy claim. *Mooney,* 1999 OK CR 34, ¶ 17, 990 P.2d at 883; *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). The crimes of Conspiracy to Commit

a Felony and First Degree (Felony) Murder are separate and distinct crimes with totally dissimilar elements; each requires proof of elements not contained in the other. Accordingly, Jones's double jeopardy claim fails.

## ERRORS AFFECTING BOTH STAGES OF TRIAL

¶ 67 Jones argues, in Proposition Ten, that he is entitled to a new trial because he was deprived of the right to be present at all critical stages of his trial in violation of due process and Oklahoma statute. Jones claims he did not knowingly and voluntarily waive his right to be present at various hearings conducted during the course of his trial. Jones states his trial counsel unilaterally waived his right to be present during certain court proceedings and on numerous other occasions the record is silent as to Jones's presence or waiver by trial counsel. Jones claims his absence on these occasions prevented him from consulting with counsel which constitutes a due process violation and a structural flaw in the proceedings against him.

¶ 68 A defendant's right to be present "at the trial" is protected by statute. 22 O.S.2001, § 583; *Dodd v. State,* 2004 OK CR 31, ¶ 20, 100 P.3d 1017, 1027; *Ryder v. State,* 2004 OK CR 2, ¶ 29, 83 P.3d 856, 864; *Perry v. State,* 1995 OK CR 20, ¶ 25, 893 P.2d 521, 527–28. The "right to be present" that Jones claims was violated is rooted primarily in a defendant's Sixth Amendment right to confront the witnesses against him. *Dodd, id.* A defendant's Fifth Amendment due process right is violated only if the defendant's absence from some portion of the proceedings is shown to have impaired his ability to defend himself. *Id.; see United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); *Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 332–33, 78 L.Ed. 674 (1934). This "right to be present" has limitations, however. *Dodd, id.*

> An accused does not have an absolute constitutional right to be present at every *in camera* discussion between court and counsel, even during the trial itself. *Davis*

*v. State,* 1988 OK CR 153, ¶ 12, 759 P.2d 1033, 1036. Nor does the statutory right to be present "at the trial" extend to *in camera* hearings or other matters outside the jury's presence. *Reid v. State,* 1970 OK CR 149, 478 P.2d 988, 999–1000, *modified* 507 P.2d 915.

*Dodd,* 2004 OK CR 31, ¶ 20, 100 P.3d at 1027–1028.

¶ 69 The record shows Jones was present for all critical stages. Jones was present at all times the jury was in the courtroom, except for one occasion when the jury was brought into the courtroom for the sole purpose being dismissed for the day. A knowing and voluntary waiver of his presence was not necessary for the pretrial hearings, motion hearings or the *in camera* hearings. *Dodd, id.* Trial counsel for Jones was always present at these hearings.

¶ 70 A defendant must be allowed to be present where his presence "bears, or may be fairly assumed to bear, a relation, reasonably substantial, to his opportunity to defend." *Lockett v. State,* 2002 OK CR 30, ¶ 9, 53 P.3d 418, 423, *quoting Snyder v. Massachusetts,* 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). In *Lockett,* this Court said "it did not intend to hold in any way that 'the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow.' " *Id.* (*quoting Snyder,* 291 U.S. at 106–107, 54 S.Ct at 332). Appellant here has not specifically shown how his presence was necessary at these various hearings or how he was deprived of his opportunity to defend his case by his absence. We find no statutory violation, no due process violation and no error.

¶ 71 In Proposition Eleven, Jones argues various trial errors and prosecutorial misconduct deprived him of a fair trial and a reliable sentencing proceeding and warrants a new trial or modification of his sentences. Jones's complaints include: improper display of emotion, improper personal opinion, misstating evidence, misleading comments, arguing guilt by association, speculation, going outside record, inflammatory demonstration, arguing that Jones committed unadjudicated crimes without a reliable basis, evoking emo-tional response, misstatement of applicable law and improper argument.

¶ 72 Many of the errors claimed by Jones were not objected to at trial; therefore, we review those claims for plain error. *Banks v. State,* 2002 OK CR 9, ¶ 41, 43 P.3d 390, 401. After carefully reviewing the arguments and record, we find no plain error. Some of the errors claimed by Jones were objected to at trial and the objections were sustained by the trial court, most with instructions or admonishments, which cured any error that may have occurred. *Slaughter,* 1997 OK CR 78, ¶ 110, 950 P.2d at 869.

¶ 73 Some of the instances Jones complains of were proper comments on the evidence, reasonable inferences based on the evidence, or evidentiary rulings by the trial court that were not an abuse of discretion. *Bland v. State,* 2000 OK CR 11 ¶ 97, 4 P.3d 702, 728. The jury was properly instructed that it was the finder of fact and that attorney argument was not evidence. Juries are presumed to follow their instructions. *Turrentine v. State,* 1998 OK CR 33, ¶ 26, 965 P.2d 955, 968. The comments were the typical sort of comments made during the normal course of closing argument and, as such, these instances of alleged improper comment fall within the broad parameters of effective advocacy and do not constitute error. *Matthews v. State,* 2002 OK CR 16, ¶ 38, 45 P.3d 907, 920.

¶ 74 We address one complaint concerning an inflammatory demonstration by the prosecutor. During sentencing stage final closing argument, the prosecutor, in describing how the victim was killed, stated Jones held the gun to Howell's head while simultaneously pointing her finger at a juror's head, as if demonstrating a gun pointed towards the juror's head. Trial counsel objected, but the prosecutor continued the demonstration using co-counsel as the victim.

¶ 75 This Court has previously upheld demonstrations that are based on the evidence presented at trial and not theatrical demonstrations. *Gilbert v. State,* 1997 OK CR 71, ¶ 94–95, 951 P.2d 98, 121. This demonstration was an attempt to illustrate the shooting based upon the evidence presented

at trial; however, the conduct involving a juror cannot be condoned. Still, we find it was not so egregious as to elicit an emotional response rather than a rational judgment from the juror or the jury and it was not so prejudicial as to deprive Jones of a fair sentencing proceeding.

▉ ¶ 76 "Allegations of prosecutorial misconduct will not cause a reversal of judgment or modification of sentence unless their cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding." *Spears v. State*, 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445. This Court looks at the entire record to determine whether the cumulative effect of improper conduct by the prosecutor prejudiced an appellant causing plain error. *Romano v. State*, 1995 OK CR 74, ¶ 54, 909 P.2d 92, 115. Having reviewed the entire record, we find neither reversal nor modification is warranted on this proposition.

## INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 77 In Proposition Eight, Jones complains that he was denied his right to effective assistance of trial counsel, guaranteed by the Sixth Amendment to the United States Constitution and corresponding provisions of the Oklahoma Constitution. Jones cites several instances of allegedly deficient performance in both the guilt-innocence phase of the trial as well as the capital sentencing phase of the trial. Jones also timely filed a motion to supplement the appeal record with information supporting his ineffective-counsel claims, and requested an evidentiary hearing thereon. *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18 App. (2003). We granted the motion to supplement and remanded the case to the district court for an evidentiary hearing on only one of the issues raised by Jones. The particulars of that claim are discussed in more detail below.

▉ ¶ 78 The analysis for each of Jones's claims is the same. To prevail on a claim of ineffective assistance of trial counsel,

Jones must demonstrate (1) that trial counsel's performance was deficient under prevailing professional norms, and (2) that Jones was prejudiced by the deficient performance. *Black v. State*, 2001 OK CR 5, ¶ 65, 21 P.3d 1047, 1070; *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674. As to the first part of this test, we indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. This presumption is due, in large part, to the many strategic choices counsel must make in any given case. So long as the choices are informed ones, counsel's decision to pursue one strategy over others is "virtually unchallengeable." *Id.* at 690–91, 104 S.Ct. at 2066. As to the second part of the test, Jones must demonstrate a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. This test need not be applied mechanistically, however. If Jones fails to demonstrate any prejudice from trial counsel's performance, then we need not determine whether the performance was in fact "deficient." *Id.* at 697, 104 S.Ct. at 2069.

¶ 79 As to the guilt-innocence stage of the trial, Jones claims his counsel was ineffective in failing to adequately investigate and present alibi witnesses. Specifically, appellate counsel alleges that trial counsel should have called Jones's mother, father, brother, and/or sister, who were prepared to swear that Jones was at home with them at the time Howell was murdered. We remanded the case for an evidentiary hearing on this aspect of Jones's ineffective-counsel claim. The district court received evidence on the issue and submitted its own findings of fact and conclusions of law. The parties also filed supplemental briefs after the hearing.

▉ ¶ 80 The evidentiary hearing established (1) that Jones's defense team was aware, before trial, that members of his family were prepared to afford him an alibi; (2) that investigation by Jones's defense team revealed a witness, Brenda Cudjoe, who plainly discredited that alibi defense[9]; and

9. Members of Jones's family claimed that Cudjoe could corroborate the alibi because she was also

at their home at the time Howell was shot. Cudjoe told a defense investigator that this was not

(3) that Jones told his counsel that he was not at home at the time of the shooting, and that his parents were mistaken. Lead defense counsel testified to his concerns, at the time of trial, that the family's "alibi" testimony would be soundly impeached, thereby ruining any credibility they might have in the punishment phase of the trial. Notably, Appellant did not testify at the evidentiary hearing. He did not claim to have ever advanced an alibi defense consonant with his family's claims. He did not deny telling lead counsel that his family's version of events was wrong.[10]

¶ 81 At trial, Jones's girlfriend testified that Jones claimed to have been somewhere on the south side of Oklahoma City—*i.e. not* at his parents' home—when Howell was murdered. This testimony was, in fact, elicited by the defense. Jones thus appears to argue that trial counsel should have presented evidence of conflicting alibis. Appellate counsel repeatedly states that it is the jury's province to determine whether witnesses are credible and defense theories are viable. This truism, however, ignores counsel's most basic function: to make informed choices among an array of alternatives, in order to achieve the best possible outcome for the client. Effective assistance of counsel means more than tossing up every conceivable argument in the client's defense, in hopes that some part will fly—or worse yet, that the sheer quantity of disorganized, unevaluated information will simply confuse the jury to the point of acquittal. The trial court concluded that counsel's decision not to present the Jones family alibi evidence was a sound trial strategy, based on sufficiently thorough investigation and evaluation of the circumstances presented, and we agree.

¶ 82 Jones goes on to attack trial counsel's decision not to present the testimony of Emmanuel Littlejohn. A multiple felon and convicted murderer, Littlejohn briefly shared a county jail cell with co-defendant Jordan while awaiting capital resentencing in his own first-degree murder case. Littlejohn told defense investigators that Jordan admitted he was falsely throwing blame on Jones, that Jordan said Jones was not involved in the Howell murder at all, and that Jordan had even gone so far as to hide the murder weapon and other incriminating evidence in the Joneses' home himself. The fact that defense counsel actually did investigate Littlejohn's claim before trial reduces Jones's argument to one over trial strategy which, as *Strickland* instructs, is much more difficult to attack. Littlejohn's criminal history presented obvious credibility problems. While he had nothing to gain from testifying on Jones's behalf, he had little to lose by perjuring himself with claims that were impossible to corroborate. Moreover, the image of Jordan planting evidence in the attic of the Jones family home, without their knowledge, might have been somewhat difficult for the jury to believe. We find nothing unreasonable about counsel's decision to forgo Littlejohn's assistance.

¶ 83 Next, Jones claims that trial counsel should have cross-examined Jordan more thoroughly, in both the guilt and punishment stages of trial, with the aim of showing the jury that Jordan was slanting his testimony in hopes of bettering his own situation. Counsel did cross-examine Jordan at length, pointing out inconsistencies in his story and otherwise attacking his credibility. Jones's arguments on appeal are nothing more than complaints about exactly how that impeachment should have been accomplished. Jordan admitted in guilt-stage cross-examination that many of the details he had previously given to police and his own attorney

---

true, and she reiterated this denial at the evidentiary hearing.

10. On appeal, Jones argues that trial counsel was ineffective for not personally interviewing Brenda Cudjoe. We disagree. One reason that investigators, rather than attorneys, are routinely assigned the task of interviewing witnesses is to ensure that, if the witness changes her story on the witness stand, the attorney is not placed in the position of being an impeachment witness.

On learning that Cudjoe's claim squared with his own client's claim, there was no need for counsel to investigate further. At the evidentiary hearing, Cudjoe reiterated that the Jones family alibi was not true. Furthermore, *Strickland* requires not just deficient performance but prejudice; appellate counsel offers nothing to show how the outcome would have been affected if counsel had personally questioned Cudjoe before trial.

were false; Jones's defense counsel methodically went over many of these untruths. Jordan also admitted, on cross-examination, that he had previously lied about his involvement in this case to help himself out. In the punishment stage, trial counsel cross-examined Jordan again about his plea negotiations, and how he stood to gain from helping the State convict Jones. The fact that counsel did not ask every question Jones is now able to formulate on appeal is not proof of deficient performance.

¶ 84 Jones also complains that trial counsel was ineffective for failing to object to the admission of expert testimony comparing the chemical compositions of lead bullets. The State presented such testimony suggesting that the bullets fired at the crime scene, bullets found in a vehicle shared by Jones and Jordan, and bullets found in the Jones home, were chemically indistinguishable, thereby suggesting that they all came from the same box of ammunition. Jones points to research casting some doubt on the validity of such analyses, and argues that counsel should have challenged the reliability of lead-bullet comparison pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We rejected a similar argument in *Bryan v. State*, 1997 OK CR 15, ¶ 43, 935 P.2d 338, 360, concluding that the defendant in that case "ha[d] not shown that this type of materials analysis amounts to a novel scientific procedure which would trigger *Daubert* scrutiny." We need not decide whether the supplemental materials provided by Jones in support of his ineffective-counsel claim require a different result here, because even if counsel's failure to challenge this evidence could be considered substandard performance, we find no prejudice. An altogether different and well-established forensic procedure—a procedure which Jones does not attack—established that, regardless of the source of the bullets, the handgun hidden in the attic of Jones's parents' home fired the bullet that killed Howell.

¶ 85 Jones also complains that counsel rendered deficient performance by advising him not to testify on his own behalf. An accused certainly has the right to testify in his own defense. During trial, Jones acknowledged his right to testify and elected not to. Jones does not allege that counsel in fact forced, threatened, or misled him into making this decision. He does not specify any particular information that he wished to testify about, or how such would have affected the outcome of the case. Jones points out that no additional record was made on the decision not to testify in the punishment stage; yet, again, he fails to support his claims with any information about how these decisions were actually made. We will not presume deficient performance based on such bald allegations. Because Jones has not offered any specific, convincing information as to why his decision was "involuntary," we cannot say that counsel was ineffective. *Hooks v. State*, 1993 OK CR 41, ¶ 36, 862 P.2d 1273, 1283.

¶ 86 Jones alleges further punishment-stage error in counsel's failure to "effectively" impeach a witness's in-court identification of Jones as the perpetrator of a prior robbery. To support the "continuing threat" aggravator, the State presented, *inter alia,* evidence that Jordan and Jones committed other "carjacking" crimes in Oklahoma City just days before a similar offense left Howell dead. Jones complains that trial counsel did not attack the testimony of one carjacking victim more thoroughly. Counsel did, in fact, point out weaknesses in the victim's identification of Jones as one of the perpetrators, as well as evidence suggesting that Jordan, not Jones, could have been the assailant. However, substantial evidence linked Jones (acting in concert with Jordan) to the carjacking, which occurred just days before the instant offenses. The stolen vehicle, a Mercedes, was recovered from a Norman apartment complex where Jones lived. After Jordan and Jones were arrested for Howell's murder, the key to the stolen Mercedes was found in the Cutlass shared by the two men. Jordan himself testified that he and Jones committed the carjacking, and Jones's girlfriend testified that Jones had talked to her about his involvement in that crime. Given this evidence, counsel may well have concluded that any more quibbling over the carjacking victim's ability to accurately gauge the

height and weight of the perpetrator was not the best use of his energies. We find nothing professionally unreasonable about this course of action.

¶ 87 For similar reasons, we reject Jones's claim that counsel should have highlighted the factual dissimilarities between the Howell carjacking and the prior carjackings. Jones relies on a list of "uncommon facts" prepared by trial counsel, which he submits in his supplementary materials. Jones fails to support his one-sentence claim with any analysis or authority whatsoever. Even still, the utility of this list is not apparent because Jones never admitted involvement in any of the carjacking crimes. There is no basis for concluding counsel acted unreasonably.

¶ 88 Jones also complains that trial counsel should have exposed an "erroneous embellishment" that a prior crime he committed was a robbery when in fact, he claims, it was merely a larceny. According to Jordan, Jones admitted to taking jewelry from a shopping mall establishment in the summer of 1999. Jordan specifically clarified that it was a robbery, not a larceny. The record simply does not support Jones's claim that the severity of this prior offense, relevant to the continuing threat aggravator, was "embellished."

¶ 89 Jones further contends that trial counsel was ineffective in advancing mental health evidence in mitigation of sentence. Jones claims that expert testimony showing he may suffer from an impulse-control disorder was "at best weakly supported and at worst unsupported and implausible." Jones does not elaborate on why this mitigation evidence was "implausible," except to imply that it is *per se* unreasonable to deny culpability in the guilt stage of a capital trial, only to tacitly admit guilt in the punishment stage (*e.g.* through evidence mitigating the defendant's role in the offense, or casting doubt on his ability to control or appreciate the nature of his conduct). We reject this broad assumption. Mitigating evidence that at least recognizes and accepts the jury's finding of guilt, despite the defendant's claims of innocence, seems to us more likely to be entertained than evidence which disrespects the jury's first-stage findings. A mitigation strategy is not professionally unreasonable simply because it was unsuccessful. Jones has failed to demonstrate that the mental-health component hopelessly conflicted with, or undermined, other evidence presented in mitigation. Trial counsel's decision to include it was not deficient performance.

¶ 90 Jones makes three final arguments: (1) that trial counsel was ineffective because "he failed to present exculpatory statements in letters to Ms. Presley [his girlfriend] under the doctrine of completeness"; (2) that counsel was ineffective because he "failed to . . . call [Jones's] brother and sister in mitigation"; and (3) that his entire trial defense team was unqualified to try a capital case. As to the first claim, Jones presents no argument or authority, other than the allegation quoted above and a reference to an affidavit from Presley contained in Jones's supplementary materials. It is unclear whether the bald denials of culpability excerpted in the affidavit were in the same letters referred to at trial, or whether they were indeed admissible at all. Because we are unable to discern the specifics of Jones's argument, we decline to review it further. *Bernay v. State,* 1999 OK CR 37, ¶ 21, 989 P.2d 998, 1007. The second claim suffers from similar deficiencies. Jones makes no attempt to explain how the testimony of his brother and sister about his good character would have been qualitatively different from the testimony given by Jones's mother and father in the punishment stage.

¶ 91 Finally, Jones's complaints about the qualifications of his trial team imply that counsel who has not been out of law school for a certain number of years, tried a certain number of capital cases, spent a certain number of hours preparing for a capital trial, *etc.,* is *per se* unable to render effective assistance to a capital defendant. We reject this notion. The ultimate test for effective assistance of counsel in any particular case remains the two-pronged test of *Strickland:* deficient performance under the circumstances at hand, and prejudice undermining confidence in the outcome of the proceeding. Jones had three attorneys, investigators, and other resources of the county public defend-

er's office behind him. This team faced several difficult challenges: a co-defendant who directly implicated Jones, eyewitness identification, incriminating statements made by Jones after the crime, flight from police, damning physical evidence hidden in Jones's parents' home, and an interlocking web of other physical and testimonial evidence consistent with the State's theory. Jones faults his trial team for failing to present a "cohesive and coherent strategy" at trial, but does not hint at just what such a strategy might have looked like.

¶ 92 In summary, neither the record on appeal, nor Jones's supplementary materials, establish that Jones's trial counsel was ineffective. Proposition Eight is denied.

## SECOND STAGE ISSUES

¶ 93 The jury set punishment at death on Count 1 after finding two aggravating circumstances existed beyond a reasonable doubt: (1) the defendant created a great risk of death to more than one person, and (2) there exists the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In Proposition Fifteen, Jones claims his death sentence must be vacated because errors relating to the aggravating circumstances violated his rights under the federal and Oklahoma constitutions. With reference to the continuing threat aggravator, Jones asks this Court to reconsider its prior holdings addressing the constitutionality of the aggravator, to reconsider its position on the use of unadjudicated acts in support of the aggravator and to find the evidence presented was insufficient to support this aggravator.

¶ 94 This Court has repeatedly upheld the constitutional validity of the continuing threat aggravator and we will not revisit the issue. *Fitzgerald v. State*, 2002 OK CR 31, ¶ 15, 61 P.3d 901, 906. We also decline to reconsider our position on unadjudicated acts offered in support of this aggravator, and continue to hold such unadjudicated acts of violence are relevant to determining whether a defendant is likely to commit future acts of violence that would constitute a continuing

threat to society. *Lockett*, 2002 OK CR 30, ¶ 34, 53 P.3d at 428–29.

¶ 95 In support of the continuing threat aggravating circumstance, the State incorporated all first-stage evidence into the sentencing stage and presented evidence Jones had prior convictions, based upon guilty pleas, to unlawful use of a fictitious name, false declaration to a pawnbroker, concealing stolen property, and larceny from a retailer. The State also presented evidence of various unadjudicated acts which included attempting to elude a police officer, unauthorized use of a motor vehicle and possession of a firearm during the commission of a felony, armed robbery of a jewelry store at Quail Springs Mall, two armed carjackings in July 1999 at the Hideaway Pizza, and a physical altercation with a detention officer.

¶ 96 Jones contends his conviction for larceny from a retailer was void because he was juvenile at the time and the trial court did not have jurisdiction to convict and sentence him. He argues use of evidence of the two armed carjackings and the jewelry store robbery based upon the testimony of his coconspirator, was not sufficiently corroborated and was not reliably proven by the State. Jones submits that had this evidence not been admitted, the remaining evidence would not have sufficiently supported the jury's finding of the continuing threat aggravator.

¶ 97 When the sufficiency of the evidence of an aggravating circumstances is challenged on appeal, we review the evidence in a light most favorable to the State to determine whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. *Ryder v. State*, 2004 OK CR 2, ¶ 74, 83 P.3d 856, 873. To support this aggravator, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. *Wackerly*, 2000 OK CR 15, ¶ 52, 12 P.3d at 16. Prior unadjudicated acts of violent conduct are admissible and relevant to the determination whether the defendant is likely to commit future acts of violence that would constitute a continuing threat to society. *Id.* Evidence of the callous nature of the crime and the defen-

dant's blatant disregard for the importance of human life supports this aggravating circumstance as well. *Id.*

¶ 98 Jones complains his larceny conviction was void, because it should have been adjudicated through the juvenile system and counsel's failure to object was ineffective assistance of counsel. We review this claim for plain error. *Simpson,* 1994 OK CR 40, ¶ 2, 876 P.2d at 692–693. Even if this larceny conviction were void and should not have been admitted, we find, in light of the other strong evidence supporting this aggravator, its admission was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. Jones cannot show he was prejudiced by counsel's failure to object and his claim of ineffectiveness fails. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

¶ 99 In assessing his claim of insufficient evidence of the continuing threat aggravator, Jones asks this Court to ignore evidence of the armed robberies (jewelry store and Hideaway Pizza robberies) because the testimony of his accomplice was used to introduce this evidence and it was not sufficiently corroborated. Oklahoma law requiring corroboration of accomplice testimony, 21 O.S.2001, § 742, on its face, applies to convictions and not to proceedings to determine punishment. *McCarty v. State,* 1998 OK CR 61, ¶ 57, 997 P.2d 1116, 1132. Even though the State was not required to corroborate Jordan's testimony about these unadjudicated offenses, it did so. Three victims testified and corroborated Jordan's testimony as to various parts of the crimes. All were subjected to cross-examination, and it was the jury's job to determine the weight of the evidence and the credibility of the witnesses.

¶ 100 In addition to the evidence showing the callous nature of the Howell murder and Jones's obvious disregard for human life, the State presented evidence that Jones had on at least three occasions taken property by force and by gunpoint. The evidence presented was sufficient to support the continuing threat aggravator.

¶ 101 Jones also complains the State's evidence did not sufficiently prove the great risk of death aggravator. This aggravating circumstance is established by showing acts which created a great risk of death to another person or persons in close proximity to the homicidal acts in terms of time, location and intent. *Harris v. State,* 2004 OK CR 1, ¶ 53, 84 P.3d 731, 751. Evidence that the defendant killed one person and threatened to kill others with the apparent ability to do so sufficiently supports this aggravator. *Id.*

¶ 102 The evidence showed Jones killed Mr. Howell while Howell was sitting in his Suburban with his sister Ms. Tobey, with his two young daughters. After he killed Howell, Jones yelled at Tobey and the children as they ran for safety and then fired another shot. The evidence showed Jones knew of the presence of others when he killed Howell, and then he threatened them with the same gun he used to kill Howell. Clearly, in this case, the State's evidence with regard to the great risk of death aggravator was sufficient. *Black v. State,* 2001 OK CR 5, ¶ 76, 21 P.3d at 1073. That Tobey and the children were not injured matters not and this aggravator was properly applied in this case. *See Salazar v. State,* 1996 OK CR 25, ¶ 9, n. 4, 919 P.2d 1120, 1123–1124, n. 4 (referencing cases where this aggravator upheld when other persons present were not injured).

¶ 103 In Proposition Seventeen, Jones contends the sentencing stage victim impact testimony denied him a fundamentally fair and reliable sentencing proceeding. In the sentencing stage of a capital murder trial, the State may present evidence "about the victim and about the impact of the murder on the family of the victim." 21 O.S. 2001, § 701.10(C). This evidence may include information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and a recommendation as to the appropriate sentence. *See generally* 22 O.S.2001, §§ 984, 984.1. In *Cargle v. State,* 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, this Court concluded that "victim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surround-

ing that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family."

■■■ ¶ 104 Jones complains that the victim impact testimony unduly emphasized the emotional impact and, taken together, was unfairly prejudicial and cumulative. However, we find the evidence properly fits within the parameters of *Cargle*. The trial court properly sustained counsel's objection to the use of the word "violent," and we find no error in the trial court's denial of the motion for mistrial. We find no error in the victim impact evidence offered in this case, and therefore no relief is warranted on this proposition.

¶ 105 In Proposition Eighteen, Jones asks this Court to reconsider whether previously adjudicated issues violated his rights to a fair trial, an impartial jury, due process, or a reliable sentencing proceeding. We decline to revisit these issues and find their prior adjudications did not have an effect on the fairness of Jones's trial or sentencing.[11] We also deny Jones's request for an evidentiary hearing and request for funds relating to his claim on the cost effectiveness of the death penalty and its value as a deterrent.

¶ 106 Proposition Nineteen also warrants no relief. A cumulative error argument does not require relief and has no merit when this Court does not sustain any other errors raised by the appellant. *Dodd*, 2004 OK CR 31, ¶ 116, 100 P.3d at 1051.

## MANDATORY SENTENCE REVIEW

¶ 107 Jones claims in Proposition Sixteen that his death sentence must be vacated under this Court's Mandatory Sentence Review and the Eighth Amendment prohibition against cruel and unusual punishment. In support of this proposition, Jones argues that his sentence of death was improperly im-

posed due to the various errors he claims occurred at his trial. We have reviewed each of Jones's propositions of error and have found none which warrant relief and we will not re-address each of those claims here.

■■■ ¶ 108 Two of the jurors told the trial court they had close friends or family members who had been killed in violent crimes. Jones's counsel did not challenge either of these jurors for cause and we will not find these jurors' past experiences somehow injected a fundamental unfairness or arbitrariness into the sentencing determination.

¶ 109 Jones also complains his death sentence violates the Eighth Amendment because it was an accident and not the type of crime warranting the death penalty. The jury considered the State's evidence of aggravating circumstances and decided Jones's conduct warranted a penalty of death. We find no evidence that race played any role in the jury's sentencing determination. We are not persuaded to vacate Jones's sentence of death and reconsider our prior holding that the jury was not required to specifically find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. *Torres v. State*, 2002 OK CR 35, ¶¶ 6–7, 58 P.3d 214, 215. Lastly, we decline to find Oklahoma's method of lethal injection constitutes cruel and unusual punishment. *See Romano v. State*, 1996 OK CR 20, ¶ 30, 917 P.2d 12, 18.

■■■ ¶ 110 In accordance with 21 O.S. 2001, § 701.13(C), we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the evidence supports the jury's finding of aggravating circumstances. The jury found the existence of two aggravating circumstances: (1) that Jones knowingly created a great risk of death to more than one person, and (2) the

11. *McCracken v. State*, 1994 OK CR 68, ¶ 49, 887 P.2d 323, 334 (meaning of life without parole is self-explanatory and no instruction required); *Smallwood v. State*, 1995 OK CR 60, ¶ 62, 907 P.2d 217, 233 (cost effectiveness of death penalty is irrelevant and denial of request to present evidence of it was proper); *Harris v. State*, 2004 OK CR 1, ¶ 52, 84 P.3d 731, 751 (trial court did not err in refusing to allow allocution before the jury or to allow defense to argue last); *DeRosa v. State*, 2004 OK CR 19, ¶ 83, 89 P.3d 1124, 1153 (rejecting victim impact as "super aggravator" argument); *Bernay v. State*, 1999 OK CR 37, ¶ 50, 989 P.2d 998, 1012 (no requirement that residual doubt is a mitigator).

existence of a probability that Jones would commit criminal acts of violence that would constitute a continuing threat to society. We found the evidence sufficiently supported each of those aggravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2001, § 701.13(C).

¶ 111 After carefully weighing the aggravating circumstances and all mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate.

### DECISION

¶ 112 We find no error warranting either reversal or modification of Jones's sentences. Accordingly, the Judgment and Sentences imposed in Oklahoma County District Court, Case No. CF 99–4373, for Counts 1, 2 and 3, are hereby **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

CHAPEL, P.J. and S. TAYLOR, J.: concur.

LUMPKIN, V.P.J.: concurs in results.

LUMPKIN, Vice–Presiding Judge: Concurring in Results.

¶ 1 I concur in the Court's decision and analysis in affirming the judgments and sentences in this case. However, in Proposition Eighteen, I would find Appellant has waived review of his claim as he has failed to cite any legal authority supporting his argument for this Court's reconsideration of previously adjudicated legal issues. *See* Rule 3.5(C), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006).